**[J-18-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | |
|---|---|
| GREENWOOD GAMING AND ENTERTAINMENT, INC.; MOUNTAINVIEW THOROUGHBRED RACING ASSOCIATION, LLC; CHESTER DOWNS AND MARINA, L LC; WASHINGTON TROTTING ASSOCIATION, LLC; STADIUM CASINO LLC; VALLEY FORGE CONVENTION CENTER PARTNERS, LP, DOWNS RACING, LP | : No. 76 MAP 2021 <br><br> : Appeal from the Order of the <br> : Commonwealth Court at No. 571 <br> : MD 2018 dated September 8, 2021 <br><br> : ARGUED: April 19, 2023 |
| v. | |
| COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF REVENUE; PAT BROWNE, SECRETARY OF THE DEPARTMENT OF REVENUE, IN HIS OFFICIAL CAPACITY | |
| APPEAL OF: GREENWOOD GAMING AND ENTERTAINMENT, INC., MOUNTAINVIEW THOROUGHBRED RACING ASSOCIATION, LLC, AND CHESTER DOWNS AND MARINA, LLC | |

**OPINION**

**JUSTICE DONOHUE**                    **DECIDED: December 19, 2023**

Since 2017, the state lottery and privately-owned casinos have been able to operate online subject to legislative restrictions on the products each may offer in that space. At issue in this appeal is the scope of those restrictions, and consequently, the boundaries of the territories in which each may operate. Greenwood Gaming and

Entertainment, Inc., Mountainview Thoroughbred Racing Association, LLC, Chester Downs and Marina, LLC, Washington Trotting Association, LLC, Stadium Casino, LLC, Valley Forge Convention Center Partners, LP and Downs Racing, LP ("Casinos") filed suit against the Pennsylvania Department of Revenue ("Department"), contending that games offered by the Lottery online impermissibly simulate slot machines, thereby violating the restrictions imposed by the General Assembly and infringing on the Casinos' share of the online market. The Commonwealth Court disagreed and dismissed their complaint. For the reasons that follow, we find that the Commonwealth Court erred in its statutory interpretation by focusing on the individual components of an iLottery game. We conclude that the determination of whether an iLottery game violates the statutory prohibition against simulating a slot machine involves a subjective assessment of the game's appearance and effect when in play. We therefore vacate the order of the Commonwealth Court and remand for further proceedings.

By way of background, we note that the State Lottery Law ("Lottery Law"),[1] enacted in 1971, created Pennsylvania's state-run lottery ("Lottery"), the net proceeds of which provide benefits and services to Pennsylvanians over the age of sixty-five. 72 P.S. §§ 3761-301, 3761-311, 3761-501. The Department is charged with administering the Lottery, which includes promulgating rules and regulations relating to its operation. Perhaps the most universally-recognizable lottery games are scratch tickets, or "scratchers," which are printed tickets overlaid with a substance that the player removes to reveal symbols or numbers. The Lottery also offers draw games, in which a player selects numbers for a jackpot drawing,[2] as well as the monitor-based games Keno and

---

[1] 72 P.S. §§ 3761-101 – 3761-2103.

[2] Examples of these offerings include the Pick 2, Pick 3, Pick 4, Cash 4 Life, Powerball and Mega Millions games.

Xpress Sports, and raffles. Privately operated gaming came to Pennsylvania in 2004 by virtue of the Race Horse Development and Gaming Act ("Gaming Act").[3] The Gaming Act first authorized only slot machine play, but this was later expanded to allow table games, including poker, roulette, blackjack, craps and baccarat. *See* 4 Pa.C.S. § 1103.

With time and technology, lotteries and casinos in other jurisdictions began to offer their products via the internet. While our General Assembly was quick to acknowledge this change in the gaming landscape, it did not immediately embrace it. In 2014, the General Assembly amended the Lottery Law to add provisions prohibiting the Department from offering a new species of game called "internet instant games" unless specifically authorized by law. The amendments defined "internet instant games" as lottery games "in which, by the use of a computer, tablet computer or other mobile device, a player removes the covering from randomly generated numbers or letters which reveal whether the instant ticket is a winning ticket for which money is paid." 72 P.S. § 3761-302. In addition to the restriction against offering internet instant games, the 2014 amendments also prohibited the Lottery from offering "any Internet-based or monitor-based interactive lottery game or simulated casino-style lottery game, including video poker, video roulette, slot machines or video blackjack[.]" 72 P.S. § 3761-303(a.1) ("Section 303(a.1)").

Despite its earlier reticence, in 2017 the General Assembly took steps to allow the Lottery and casinos to operate online. Through Act 42,[4] the General Assembly amended the Lottery Law and the Gaming Act to allow expansion into the virtual world. Act 42 authorized the creation of "iLottery," a platform through which players access lottery

---

[3] 4 Pa.C.S. §§ 1101-1904.

[4] 4 Pa.C.S. §§ 501-505.

products,[5] and the offering of "iLottery games," which it defined as "[i]nternet instant games and other lottery products offered through iLottery. The term does not include games that represent physical, Internet-based or monitor-based interactive lottery games which simulate casino-style lottery games, specifically including poker, roulette, slot machines or blackjack." 4 Pa.C.S. § 502 ("Section 502"). Within Section 502, the General Assembly also included a definition of "internet instant game" that differs from the definition it used when amending the Lottery Law in 2014. Act 42 defines internet instant game as follows:

> **Internet instant game**. A lottery game of chance in which, by the use of a computer, tablet computer or other mobile device, a player purchases a lottery play, with the result of play being a reveal on the device of numbers, letters or symbols indicating whether a lottery prize has been won according to an established methodology as provided by the lottery.

*Id.*

Act 42's amendments allowed casinos to offer "interactive gaming," defining "interactive game," inter alia, as "[a]ny gambling game offered through the use of communications technology that allows a person, utilizing money, checks, electronic checks, electronic transfers of money, credit cards or any other instrumentality to transmit electronic information to assist in the placement of a bet or wager and corresponding information related to the display of the game, game outcomes or other similar information[,]" but expressly excluding "[a] lottery game or [i]nternet instant game as defined in [the Lottery Law]" and " iLottery under Chapter 5 (relating to lottery)." 4 Pa.C.S.

---

[5] "iLottery" is defined as "[a] system that provides for the distribution of lottery products through numerous channels that include, but are not limited to, web applications, mobile applications, mobile web, tablets and social media platforms that allow players to interface through a portal for the purpose of obtaining lottery products and ancillary services, such as account management, game purchase, game play and prize redemption." 4 Pa.C.S. § 502.

§ 1103. The Department began offering iLottery games on May 22, 2018, while casinos that had obtained the proper licenses began offering interactive gaming in July 2019.

In August 2018, during the period between the launch of iLottery and interactive casino gaming, the Casinos filed a petition for review in the Commonwealth Court, alleging that the Department was offering iLottery games that simulate slot machines in violation of Section 502 and Section 303(a.1).[6] They asked the court to declare that the Lottery was so violating the law and to enjoin the Lottery from offering any such offending games. Petition for Review, 8/22/2018, at 19.[7]

In October 2020, a five day trial commenced, at which the Casinos focused on what they deemed to be features, both in the technical design of the games and in features observable by players, that caused the iLottery games to simulate slot machines. The technical aspects included the use of random number generators, par sheets, certification of their mathematical model and the use of a return to player ratios ("RTP") similar to slot RTPs. As for customer-facing features, the Casinos alleged that iLottery games mimic the way that slot machines reveal wins, and that their use of reveal all and auto play functions, the availability of bonus games and adjustable bets, and the use of unlimited play and nondepleting prize pools are all characteristics of slot machines and therefore, any iLottery game that utilizes these features impermissibly simulates a slot machine. In its defense, the Department conceded that iLottery games do incorporate most of the features identified by the Casinos; however, it argued, those features are not unique to slot machines. Rather, the Department maintained that those features are

---

[6] Although the Department, in an exercise of its regulatory authority, has developed some regulations and definitions related to the iLottery, it has not defined "simulate" or "casino-style." *See* N.T., 10/26/2020, at 82.

[7] In June 2019, the Casinos filed an application for special relief in the nature of a preliminary injunction. Following a hearing, the Commonwealth Court denied that application. Commonwealth Court Order, 7/12/2019.

found in traditional lottery products. The Department contended that the only defining features of slot machines are spinning reels and pay lines, and because no iLottery games use those features, they cannot simulate slot machines. The Department presented a robust body of evidence in support of its position, including the testimony of Michael Lightman, who was offered as an expert in the development and design of slot-style games, internet slot games, and iLottery games.[8] Mr. Lightman's opinion provided the basis for the Department's position that that the defining features of slot machines are spinning reels and pay lines, such that without their presence, an iLottery game could not be deemed to simulate a slot. N.T., 10/29/2020, at 970.

In the end, the Commonwealth Court agreed with the Department. The court determined that resolution of the Casinos' claims turned on determining "whether the legislature intended iLottery games to merely be online versions of instant tickets … and … what the legislature intended to authorize and prohibit when it described the prohibition as relating to the simulation of 'casino-style' games." Commonwealth Court Opinion, 5/25/2021, at 29. It answered the first question in the negative. It recognized that in Section 502, the General Assembly provided a definition for "internet instant game" that differed from the definition contained in the Lottery Law. The court observed that the definition contained in the Lottery Law refers only to an "instant ticket," characterizes the result as "a winning ticket for which money is paid," and referencing one specific reveal of result – the removal of a covering. *Id.* at 31 (quoting 72 P.S. § 3761-302). It further observed that the definition provided in Section 502 refers to internet instant games as "lottery play" that may entitle a winner to a "lottery prize," and that a result is "revealed"

---

[8] Although the Casinos stipulated to Mr. Lightman's qualification as an expert in these fields, during trial, the Casinos objected to and moved to strike Mr. Lightman's testimony. The court took the objection under advisement and, for reasons that we discuss in further detail infra, ultimately denied the motion to strike.

by the device on which the game is played, rather than by the removal of a covering by the player. *Id.* The court reasoned that the difference in these definitions revealed that the Legislature "no longer linked authorized internet instant games only to instant tickets," but "broadened the bases of those games to lottery plays in general." *Id.*

To answer the second question – the restrictions on the online games the Lottery is authorized to offer – the Commonwealth Court focused on the terms "reveal," "simulate" and "casino-style" as used in both Section 502 and Section 303(a.1). Noting that they are undefined within the statutes, the court turned to the dictionary definitions thereof. "Reveal," it discerned, means to "make known, disclose or divulge." *Id.* at 32-33. It defined "simulate" as "to give or assume the appearance or effect of," and illustrated this definition by identifying various instances of games simulating other games. *Id.* at 33. The court found "the most clear example" of simulation to be an iLottery game called Creepy Cash because it "creates a likeness or appearance of the casual game Candy Crush." *Id.* It also found that Class II slot machines create the appearance or likeness of slot machines because they show bingo results through the use of pay lines and spinning reels, and that the Xpress Sport lottery games create the appearance of a horse or car race to reveal the results of a pick lottery game. *Id.* As for "casino-style," the Commonwealth Court deduced the following:

> In determining what is meant by "casino-**style**" slot machines, the term "style" is "a **particular** kind, sort or type, as with reference to form, appearance or character" or "a particular manner or technique by which something is done, created or performed" of a casino slot machine and "-style" is "being in the style of" a casino slot machine. "Particular" is defined as "of, or relating to, a single specific … thing group or class …. , rather than to others or all; specific rather than general' or 'of, relating to, or being a single person or thing."

*Id.* (emphasis in original). Incorporating these definitions into the portions of Section 502 and Section 303(a)(1) at issue, the Commonwealth Court determined that the General

Assembly has prohibited the Lottery from offering internet instant games that "create a likeness or assume the appearance of a game that is in the style, with reference to form, appearance or character, particular to a casino slot machine." *Id.* Thus, the court concluded, the Casinos must prove that the features of iLottery games they identify cause those games to create a likeness, or assume an appearance "in form, appearance or character," that is particular to a slot machine. *Id.* at 33-34.

The court found the statutory language at issue ambiguous because of the "different definitions of internet instant games, the undefined terms, and the parties' interpretations," and "resolved the ambiguity with the understanding that the legislature does not intend to create an absurd or unreasonable result or a result impossible of execution." Commonwealth Court Opinion, 9/8/2021, at 6. Thus, and in recognition of the fact that the General Assembly intended for both the Lottery and casino gaming to co-exist in the digital arena, the court construed the restrictions in the Section 502 definition of "iLottery game" and in Section 303(a.1) regarding "casino-style slot machines" narrowly, reasoning that they preclude the Department only from utilizing features or characteristics particular to casino-style slot machines. *Id.* at 7. It clarified that features are not particular to slot machines when they may be found in digital gaming and media, in social or casual games, or in traditional lottery products; thus, the court concluded, "to hold that the use and/or presence of features in slot machines, whether land-based or online, makes those features 'casino-style' and subject to their exclusive use by casinos, would unreasonably restrict the Lottery's ability to use modern and popular technology and game features[.]" Commonwealth Court Opinion, 5/25/2021, at 35. "Conversely," the court continued, "it would be unreasonable to preclude the [C]asinos' use of the same features in slot machines simply because they may also be used in iLottery games. The [c]ourt presumes the legislature did not intend such an absurd result." *Id.*

Applying this standard, the court determined that all of the features identified by the Casinos may be found in traditional lottery products, casual social games, or are simply the result of technological advances in online gaming, and therefore are not unique to slot machines. *Id.* at 44-45. The only features it found to be particular to slot machines are spinning reels and pay lines, neither of which are used in iLottery games. Commonwealth Court Opinion, 9/8/2021, at 7. Thus, the Commonwealth Court concluded denied the relief sought.

In a separate opinion, the court denied the Casinos' motion to strike Mr. Lightman's testimony.[9] The premises of the motion were the Casinos' claims that Mr. Lightman's testimony regarding the design and development of traditional lottery products exceeded the scope of his expert qualifications and that his opinions were impermissibly based on an idiosyncratic definition of slot machine. The court began its explanation for its ruling with the well-worn principles that expert testimony is admitted in the trial court's discretion; that expert testimony must be based on more than the witness' personal belief and must be supported by facts, testimony or empirical data; and that the expert must be able to cite "some scientific authority" that he applied to the facts at hand and which supports his ultimate conclusion. Commonwealth Court Opinion, 5/25/2021 (Motion to Strike), at 2-3 (citing *Snizavich v. Rohm & Haas Co.*, 83 A.3d 191, 195 (Pa. Super. 2013)). The court reviewed the transcript and concluded that Mr. Lightman's testimony regarding traditional lottery products was linked to his development and design of iLottery products and online lottery products in general, as the court expressly permitted. *Id.* at 7. The court also rejected the Casinos' objections to Mr. Lightman's opinion that an essential characteristic of a slot machine is a pay line and as to what would constitute a simulation of a slot

---

[9] As noted above, the Casinos moved to strike Mr. Lightman's testimony. The court took the matter under advisement and instructed the Casinos to address their motion in a post-trial brief, which they did.

machine, reasoning that his thirty years of experience designing slot machines for casinos and online products for lotteries provide him the proper foundation to permit him to offer an expert opinion. *Id.* at 7-8.

In a post-trial motion, the Casinos sought judgment notwithstanding the verdict or a new trial, which ultimately proved unsuccessful. In support of their motion, the Casinos argued, of relevance here, that the Commonwealth Court erred in its statutory interpretation and in denying its motion to strike Mr. Lightman's testimony. In its ensuing opinion, the court first defended its statutory interpretation and then turned to the challenged evidentiary ruling. Although it largely relied on its prior opinion, it further explicated regarding the Casinos' claim that Mr. Lightman was not qualified as an expert in slot games. The court's reasoning on this point mirrored its reasoning with regard to the scope of his testimony, in that the court relied on the fact that Mr. Lightman was disclosed as an expert in slot-style games and that his experience with games "in the style of" slots includes specialized knowledge in slot games generally. Commonwealth Court Opinion, 9/8/2021, at 13. Thus, it found that Mr. Lightman's expert knowledge in designing internet slot games extends to slot games generally, and therefore, that its ruling was sound. *Id.*

The Casinos then filed the instant appeal as of right. The issues they present are as follows:

> 1. Whether the [Commonwealth Court] committed reversible error by misinterpreting and misapplying Act 42 of 2017, where, inter alia, (a) in applying the definition of "simulate," the [c]ourt superimposed an exclusivity requirement not found in any law, regulation, or definition of any statutory term; (b) under the [c]ourt's highly restrictive interpretation of "casino-style lottery games," an iLottery game would need to effectively replicate an actual slot machine in order to "simulate" a "casino-style lottery game," thus rendering that term meaningless in Act 42; and (c) the [c]ourt failed to consider the simulation of the games as a whole and

instead improperly limited its evaluation to reviewing the objectionable features of the iLottery games in isolation?

2. Whether the [Commonwealth Court] committed reversible error by ignoring undisputed evidence and holding that none of the features used in iLottery games "simulate" "casino-style lottery games?"

3. Whether the [Commonwealth Court] committed reversible error by admitting, considering, and relying on the testimony of [the Department's] proffered expert, Michael Lightman?

Casinos' Brief at 7.

The Casinos first challenge the court's interpretation of Sections 502 and 303(a.1) as faulty for incorporating overly-restrictive definitions of "simulate" and "casino-style." In their view, the court's ruling departs not only from the dictionary definition of "simulate" but also from the definition of "simulate" the parties agreed upon, which was "to assume the character or appearance of something else." Casinos' Brief at 44-45. The Casinos contend that it is possible to assume the character or appearance of something without adopting all of its unique characteristics. They further challenge this definition as inconsistent with the legislative intent behind Act 42, which was to add to the Gaming Act a prohibition that mirrors the prohibition in Section 303(a.1) of the Lottery Law, added in 2014, against offering games that appear to players as games offered in casinos, thereby carving out separate space online for casinos and the Lottery to operate. *Id.* at 46-47. They fear that the narrow definition employed by the Commonwealth Court will diminish the carefully constructed prohibitions, such that the Lottery will offer games that emulate the experience of slot machine play that do not incorporate spinning reels and pay lines. *Id.* at 47. The Casinos argue that the Commonwealth Court's definition has effectively re-written the statute by substituting "replicate" for "simulate," in violation of well-settled principles of statutory construction. *Id.*at 47-48.

The Casinos similarly fault the court's determination that for a game to be deemed "casino-style" it must incorporate features that are particular to a given casino game and its subsequent determination that the only features particular to slot machines are spinning reels and pay lines. *Id.* at 49. By way of illustration, the Casinos point to a particular game offered by the Lottery on the iLottery platform, Volcano Eruption, which is also offered as a slot machine on the website of the Golden Nugget, a New Jersey casino. *Id.* at 50. The Casinos explain that for Volcano Eruption to be offered on that casino's website, it had to meet the standards of a slot machine; however, it employs neither spinning reels or pay lines, and therefore would not meet the definition of a slot machine created by the Commonwealth Court. *Id.* at 50-51. Beyond this "irreconcilable" contradiction, the Casinos argue that the Commonwealth Court's narrow definition also denies the General Assembly's intent to keep iLottery from cannibalizing the Casinos' share of online gaming and ensuring that these entities provide different online gaming experiences. They point to "casino-style" as the operative qualifier, which they argue "necessarily connotes something beyond actual casino games[.]" *Id*. at 51.

In further support of their position, the Casinos emphasize that the General Assembly has prohibited the Lottery from offering casino-style **games** as part of the iLottery, not casino-style **features**, such that the focus when interpreting the subject statutes is rightly on whether an iLottery game, when considered wholistically, simulates the experience of playing a casino-style game (including slot machines), not whether an iLottery game incorporates a feature that is particular to slot machines. *Id.* at 54. They draw support from a federal case out of the Middle District of Pennsylvania, *Telesweeps of Butler County, Inc. v. Kelley*, No. 3:12-CV-1347, 2012 WL 4839010 (M.D. Pa. Oct. 2012), wherein that court found that a sweepstakes game impermissibly simulated a "casino-style game" based on its evaluation of the "experience" created by the game as

it is played. *Id.* at 55. The Casinos argue that here, the Department has simulated the experience of playing slot machines by using the same designs and mathematical models found in slot machines when designing iLottery games. Moreover, the Casinos contend, it matters not whether other games, like traditional lottery products or social and casual games, have used some of the features they identified as particular to slot machines because only slot machines combine the identified features, which creates the slot machine experience. *Id.* at 56.[10]

The Department responds that despite the Casinos' protestations, their proposed definitions are materially indistinguishable from those fashioned by the Commonwealth Court, as "particular" - the term used by the court - and "characteristic" – the term favored by the Casinos - are synonyms. Department's Brief at 33-34. In that vein, the Department assails the Casinos' contention that the court narrowed the meaning of "style" as used in the term "casino-style" or effectively substituted "replicate" for "simulate," accusing the Casinos of engaging in a "grammatical bait and switch" to construct their arguments. *Id.* at 35-37. Rather, the Department perceives the prohibition as a matter "directed at the judgment of the player" because "everybody" knows a slot machine when they see one. *Id.* at 38.[11]

The Department also defends the Commonwealth Court's interpretation as faithful to legislative intent. It agrees that the restrictions at issue reveal the General Assembly's intent that the Lottery and casinos co-exist online and rebuffs the Casinos' claim of cannibalization by pointing to the Casinos' multi-million dollar reported gross revenues for

---

[10] The Commonwealth Court claimed that the Casinos did not forward this position at trial. The Casinos dispute this assertion by reference to a portion of their closing argument. Casinos' Brief at 56-57.

[11] The Department points out that the expert witnesses agreed that "the vast majority" of slot machines use spinning reels and pay lines, thereby intimating that "everybody" recognizes these as "iconic" slot machines features. Department's Brief at 38.

the first nine months of the 2021-2022 fiscal year. *Id.* at 39-40. It rejects the Casinos' claim that the Commonwealth Court erred by failing to consider the features in sum as meritless; because the Casinos failed to prove that any of the features individually are particular to slots, they could not amount to more in the aggregate. "Zero plus zero still equals zero," it argues. *Id.* at 42.

Analysis

Challenges to statutory interpretation present questions of law; as such, our standard of review is de novo and the scope of review is plenary. *Vellon v. Dep't of Transp., Bureau of Driver Licensing*, 292 A.3d 882, 890 (Pa. 2023). The objective of statutory interpretation is to discern the intent of the General Assembly and give effect thereto. 1 Pa.C.S. § 1921(a); *Povacz v. Pa. Pub. Util. Comm'n*, 280 A.3d 975, 991 (Pa. 2022). The best indicator of the Legislature's intent is the plain language of a statute, and where the language is clear and unambiguous, we give effect to the plain language thereof. *Id.* It is only when the statutory language is ambiguous that courts engage principles of statutory construction to aid in their interpretive task. *Franczyk v. Home Depot, Inc.*, 292 A.3d 852, 856 (Pa. 2023). A statute is ambiguous when it is susceptible to two at least two reasonable interpretations. *Povacz*, 280 A.3d at 991. "[W]hile we must consider the statutory language in its full context before we assess ambiguity, we must not overlabor to detect or manufacture ambiguity where the language reveals none." *Reibenstein v. Barax*, 286 A.3d 222, 230 (Pa. 2022) (quoting *Sivick v. State Ethics Comm'n*, 238 A.3d 1250, 1263 (Pa. 2020)). We strive to give effect to each word, *id.*; 1 Pa.C.S. § 1921(a), and are ever mindful that a court may not disregard unambiguous statutory language in service of what it believes to be the spirit of the law. *Gavin v. Loeffelbein*, 205 A.3d 1209, 1221 (Pa. 2019).

As instructed by these principles, we begin by considering the language at issue in its full context.  Sections 502 and 303(a.1) are, as recognized by the parties and the Commonwealth Court, part of statutory schemes carefully crafted to create two separate and distinct zones of operation for gaming.  A lottery is a game of chance, the essence of which is the drawing of lots at random for a prize.  *See Lottery,* MERRIAM WEBSTER, *https://www.merriamwebster.com/dictionary/lottery#:~:text=%3A%20a%20drawing%20o f%20lots%20used,to%20be%20determined%20by%20chance* (last visited July 10, 2023).  Through the Lottery, the Department offers many games whose mechanics reduce to fit that general description, although they go about the drawing of lots in varied ways.  With pick and draw games, players select numbers or have numbers selected for them in the hopes that they match winning numbers drawn by the Lottery.  Keno and Xpress Sports function similarly, in that they also involve the selection of numbers by a player and the subsequent drawing of winning numbers by the Lottery.  In the case of these games, however, the results are revealed on a monitor as opposed to through a daily or weekly drawing.  Scratcher tickets are created in batches with the outcomes determined at the time the tickets are created; as such, the "drawing" of the winning lots is predetermined, and the results are revealed when the player removes the covering from the ticket.  The Lottery has been a part of this Commonwealth as a revenue-generating measure since 1971.  Its proceeds are used to benefit Pennsylvanians over the age of sixty-five.  72 P.S. § 3761-301.  "All moneys received" from the operation of the Lottery are deposited into the State Lottery Fund, and the appropriation of these funds is strictly limited by the law.  72 P.S. § 3671-311.[12]

---

[12]  The State Lottery Fund is used for three purposes: (1) to pay prizes to the holders of winning lottery tickets; (2) to pay for expenses attendant to the operation of the lottery, and (3) for property tax relief and free or reduced transit fares for those over sixty-five years of age.  72 P.S. § 3761-311(b).

The Gaming Act authorizes gaming by casinos that obtain the proper licenses in order "to provide a significant source of new revenue to the Commonwealth to support property tax relief, wage tax reduction, economic development opportunities and other similar initiatives." 4 Pa.C.S. § 1101(3). The Gaming Act, which followed the Lottery Law by more than thirty years, permits types of games entirely distinct from those offered by the Lottery; license holders are permitted to offer not only slot machine play, but also a host of table games, which include roulette, baccarat, blackjack, poker and craps, among others. [13] *See* 4 Pa.C.S. § 1103. Indeed, from its inception, the Gaming Act has prohibited license holders from offering "lottery games of the Pennsylvania State Lottery as authorized … by the [] Lottery Law." *Id.* A commonality lies, however, in the fact that both the Lottery and private gaming provide revenue streams that benefit the people of this Commonwealth, and therefore, the Commonwealth itself.

The statutory provisions at issue here are the definition of "iLottery Game" in Section 502 and the restriction found in Section 303(a.1). We begin with the Section 502 definition of "iLottery Game:"

> "iLottery game." Internet instant games and other lottery products offered through iLottery. The term does not include games that represent physical, Internet-based or monitor-based interactive lottery games which simulate casino-style lottery games, specifically including poker, roulette, slot machines or blackjack.

4 Pa.C.S. § 502. Within Section 303, "Powers and duties of secretary," subsection (a.1) addresses prohibitions on the secretary's powers and duties:

> Prohibitions.--The secretary may not offer any [i]nternet-based or monitor-based interactive lottery game or simulated casino-style lottery game, including video poker, video

---

[13] Entities interested in obtaining slot machine licenses are required to pay initial licensing fees of up to $50 million. To obtain a certificate to offer additional types of gaming, a slot machine license holder is required to pay additional fees that can exceed $20 million. *See* 4 Pa.C.S. §§ 1209, 13A61(a).

roulette, slot machines or video blackjack, through the State Lottery.

72 P.S. § 3761-303(a.1). The Commonwealth Court found ambiguity in these provisions, but we disagree. As noted above, ambiguity exists when statutory language is susceptible to more than one reasonable interpretation. *Povacz*, 280 A.3d at 991. The parties have not offered competing definitions of "simulated" or "casino-style," nor did they argue that the language was ambiguous.[14] Despite declaring the existence of an ambiguity, the Commonwealth Court did not identify what competing reasonable interpretations of this statutory language led it to that conclusion. Our review reveals that instead, it found ambiguity based upon the parties' competing arguments as to the separate (and subsequent) issue of whether features identified by the Casinos result in simulated slot machine play. Commonwealth Court Opinion, 5/25/2021, at 34. In other words, the Commonwealth Court found that the parties offered reasonable competing applications of the statutory language, applications that necessarily come after interpretation. To be sure, the court found concrete and definitive definitions of "simulate" and "-style," and gave no indication that they could be susceptible to other meanings. Its analysis, however, deviates from this unambiguous statutory language by shifting its focus to distinct features of slot machines.

As recognized above, we consider the language at issue in context and not in isolation or divorced from it. *Barax*, 286 A.3d at 230. The dispute has been focused on the terms "simulate" and "casino-style." Neither Act 42 nor the Lottery Law provide definitions for "simulate" or "casino-style." But the lack of statutory definitions does not preclude a plain-language analysis; we may, for instance, turn to dictionaries to discern a word's common meaning without first having to find the existence of ambiguity. *Id.* at

---

[14] In fact, the parties agreed that "to simulate" means to assume the character or appearance of something else. Petitioners' Post-Trial Brief at 37; Respondents' Post-Trial Proposed Findings of Facts and Conclusions of Law at 11.

231. Although there is a slight variation in phrasing, both Section 502 and Section 303(a.1) provide that the Department may not offer games through its iLottery platform that simulate casino-style games. The plain and common meanings of these terms dispel any notion of ambiguity. To simulate is "to give or assume the appearance or effect of[,] often with the intent to deceive: imitate." *See Simulate*, MERRIAM WEBSTER, https://www.merriamwebster.com/dictionary/simulate?utm_campaign=sd&utm_medium =serp&utm_source=jsonld (last visited July 10, 2023). "Simulate suggests a close imitation of the appearance of something[,]" for instance, "cosmetics that simulate a suntan." *Id.* As these definitions illustrate, to determine whether an item simulates another involves an assessment of the appearance or impression given by the item. The use of "style" to modify a noun creates an adjective meaning "to be in the style of" the predicate noun. *See Style*, MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/style (last visited July 10, 2023). Here, "-style" modifies "casino;" thus giving the meaning of "in the style of a casino." Read in fuller context, "casino-style" modifies "lottery game;" which reveals that the General Assembly has prohibited lottery games in the style of games offered by casinos. This is evident by the fact that in both provisions, the General Assembly included a non-exclusive list of games found exclusively in casinos. That the dictionary yielded these definitions is not surprising, as they comport with the common, everyday understanding of these terms.

Employing these definitions, we find that the language is plain and unambiguous. It prohibits the Department from offering iLottery games that give the appearance or effect of casino games. The class of casino games that may not be simulated includes, but is not limited, to the games that are specifically listed within Section 502 and Section 303(a.1), both of which include slot machines. This interpretation is consistent with the General Assembly's historic efforts to keep lottery games and casino games in separate

spheres.[15] The Commonwealth Court's more narrow interpretation does not honor this longstanding, carefully constructed division. It reduces slot machines to spinning reels and pay lines, which allows the Department to offer games that present in appearance and play as slot machines, so long as the games do not use spinning reels and pay lines. This is problematic for two reasons. First, the statutory definition of a slot machine provides that slot machines may use spinning reels but it does not require them, and it is silent as to pay lines. *See* 4 Pa.C.S. § 1103.[16] Thus, by definition, a slot machine in

---

[15] A demonstration of these efforts is found in the Gaming Act's definition of an interactive game as "[a]ny gambling game offered through communications technology" but specifically excluding "a lottery game or internet instant game as defined in … the [Lottery Law]" and "iLottery under Chapter 5 (relating to lottery)." 4 Pa.C.S. § 1103. This proscription mirrors that found in Sections 502 and 303(a.1), underscoring the General Assembly's efforts to reserve certain games for the Lottery and withhold them from casinos.

[16] The definition provides, in relevant part that the term "slot machine" includes

> (i) Any mechanical, electrical or computerized contrivance, terminal, machine or other device approved by the Pennsylvania Gaming Control Board which, upon insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever, including the use of any electronic payment system except a credit card or debit card, is available to play or operate, the play or operation of which, whether by reason of skill or application of the element of chance or both:

> (A) May deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, whether the payoff is made automatically from the machine or manually.

> (B) May utilize spinning reels or video displays or both.

> (C) May or may not dispense coins, tickets or tokens to winning patrons.

(continued…)

Pennsylvania need not employ spinning reels or pay lines. This is in obvious conflict with the Commonwealth Court's conclusion that they are the defining characteristics of slot machines. Indeed, uncontroverted evidence of record establishes that slot machines do not universally use spinning reels or pay lines. This was demonstrated by testimony that with the development of video slot machines in the 1970s, slot machines began to evolve beyond the use of spinning reels and pay lines; that an essential component of video slot play is the bonus game, which is a game separate and apart from the slot play and has long has incorporated cascading or exploding tiles and large wheels to reveal the results of the game; and that slot machines today are designed without pay lines as part of the industry's attempt to lure a new demographic of younger players. *See* N.T., 10/26/2020, at 153, 169-70, 177, 203-13; N.T. 10/29/2020, at 954. We cannot ignore that Mr. Lightman, the Department's expert, agreed that not all slot machines use these features. N.T., 10/29/2020, at 958-59. The Commonwealth Court acknowledged as much,

---

(D) May use an electronic credit system for receiving wagers and making payouts.

(ii) Associated equipment necessary to conduct the operation of the contrivance, terminal, machine or other device.

(iii) A skill slot machine, hybrid slot machine and the devices or associated equipment necessary to conduct the operation of a skill slot machine or hybrid slot machine.

(iv) A slot machine used in a multistate wide-area progressive slot machine system and devices and associated equipment as defined by the Pennsylvania Gaming Control Board through regulations.

(v) A multi-use computing device which is capable of simulating, either digitally or electronically, a slot machine.

4 Pa.C.S. § 1103.

Commonwealth Court Opinion, 5/25/2021, at 43, yet it reached the inconsistent conclusion that slot machines are defined by the use of spinning reels and pay lines.

Second, the Commonwealth Court's interpretation reads the term "simulate" out of the statutes by limiting the prohibition to games that incorporate only particular features unique to a casino game (in this instance, a slot machine). *See Loeffelbein*, 205 A.3d at 1221 (providing that statutory interpretation must not render any provision extraneous or produce an absurd result). Had this been the General Assembly's intent, it simply would have prohibited the Lottery from offering casino games. By including within the prohibition games that simulate (i.e., imitate the appearance of) games offered by casinos (explicitly including slot machines), the General Assembly broadened the prohibition and demonstrated its intent to restrict the Lottery from offering games that imitate a casino game in look or function. Our conclusion is supported by the General Assembly's expansive definition of a slot machines, which includes "[a] multi-use computing device which is capable of simulating, either digitally or electronically, a slot machine." 4 Pa.C.S. § 1103. This reveals the intent to include within the definition of slot machines not only the devices that meet the technical specifications of a slot machine, but also certain devices that imitate slot machines in play. An interpretation of this breadth is in harmony with the history of these industries to offer wholly distinct kinds of games; a history that neither the parties nor the Commonwealth Court dispute. The Commonwealth Court's restrictive interpretation is not in accord with this history.

Thus, we find that the plain language of these provisions reveals that their shared prohibition is broader than that found by the Commonwealth Court. The statutory restriction proscribes the Department from offering iLottery games that simulate the games that casinos, by virtue of the Gaming Act, are authorized to offer. As is relevant to the dispute before us, it prohibits the Department from offering iLottery games that

mimic slot machines in operation.[17]   This requires a subjective assessment of the appearance and play function of an iLottery game that cannot be reduced to an objective inquiry regarding the presence or absence of pay lines and spinning reels.[18]   Our interpretation does not add or ignore terms and it is consistent with the long-established legislative scheme by which our General Assembly created and maintained two separate spheres of gaming.  The Commonwealth Court's more narrow interpretation threatens to dissolve this legislatively created barrier.  On remand, the Commonwealth Court must apply the statutory prohibition as we have interpreted it, which focuses on the overall appearance and experience of play of an iLottery game, not the presence of any particular feature.[19]

By way of example, the evidence developed at trial establishes that slot machines have used a variety of methods to reveal results since they began to transition to video format in the 1970s,  N.T., 10/26/2020, at 170-71, and that these methods have grown to include the use of cascading and exploding tiles and wheels.  *Id.* at 176-78.  The Lottery began to explore different methods of reveal in the 1990s. N.T., 10/29/2020, at 945. When considering this evidence through the proper lens, the court's focus should be on whether and to what extent the use of these features in iLottery games, after they had

---

[17]  We emphasize that the term "slot machine" in Section 1103 is defined as, inter alia, a "contrivance, terminal, machine or other device **approved by the Pennsylvania Gaming Control Board**." 4 Pa.C.S. § 1103 (emphasis added).  Whether an iLottery game mimics a slot machine would, at the very least, require an examination of and a comparison to actual Board-approved slot machines.

[18]   To be clear, our holding does not necessarily negate the relevance of evidence regarding the "mechanics" behind the game's operation, such as mathematical models or RTP ratios as such evidence might be offered to show that the components contribute to simulation of slot machine play.

[19]  We make no judgment as to how the iLottery games challenged by the Casinos will fare under this interpretation.

been used in video slot machines for decades before that, causes iLottery games to take on the appearance of slot machines or impart on the player a slot machine-like experience. This is in contrast to the analysis that the court applied, which focused on its finding that these features were found in other kinds of games (the aforementioned casual social games) and concluded that one gaming industry should not be allowed to leverage these outside sources for game design while the other may not. *See* Commonwealth Court Opinion, 5/25/2021, at 44-45.

Also of note is the Commonwealth Court's consideration of the "reveal all" feature offered in iLottery games. The court found that the iLottery use of a "reveal all" button is essentially a digital analog of the "scratch to cash" feature historically found on scratch tickets, which allows a player to determine whether the ticket is a winner by uncovering and scanning a single bar code without having to play the game. *Id.* at 35-36. This finding could support a conclusion that the "reveal all" feature of iLottery games does not contribute to the creation of a slot machine-like player experience because it is, and long has been, found in traditional lottery products. Yet, it does not foreclose a finding that when this feature is combined with other features, an iLottery game impermissibly simulates a slot machine. The focus is on the overall presentation and effect of the challenged game, not on individual features. The court's analysis of each feature identified by the Casinos was on whether the feature was "a signature, iconic, or [] key feature particular to casino slot machines." *Id.* at 36. This standard does not comport with the broader statutory prohibition against simulating a casino-style experience.

The Casinos' remaining issues consist of a weight-of-the-evidence claim and a challenge to the court's denial of its motion to strike Mr. Lightman's testimony. We need not reach the merits of either. In light of our holding, on remand the Commonwealth Court will have to reevaluate the evidence of record completely, which renders the weight-of-

the-evidence claim moot. Our holding also impacts the vitality of the expert testimony offered by Mr. Lightman. Mr. Lightman testified that the "hallmarks" of slot machines are spinning reels and pay lines, N.T., 10/29/2020, at 970, but he explained that this opinion was based on his own definition of what constitutes a slot machine and agreed that Pennsylvania's statutory definition of a slot machine does not include pay lines. *Id.* at 1068-70. Given the standard that we have set for the evaluation of whether an iLottery game simulates a slot machine, which includes the explicit rejection of the use of a standard by Mr. Lightman that runs afoul of the statutory definition of a slot machine, the Commonwealth Court will have to reassess not only the credibility of Mr. Lightman's opinion, but also the relevance of it in the event the lottery continues to rely on his position.

The order of the Commonwealth Court is vacated and this matter is remanded for proceedings consistent with this opinion.

Chief Justice Todd and Justices Dougherty, Wecht and Brobson join the opinion.

Justice Mundy files a concurring and dissenting opinion.